[Crim. No. 12839. First Dist., Div. One. Nov. 12, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
LEROY VIRGIL BRECKENRIDGE, Defendant and Appellant.

## COUNSEL

William P. Daley, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg, April Kestell Cassou and Timothy A. Reardon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**\*—Defendant has appealed from the judgment and sentence[1] imposed by the trial court following his conviction by jury verdicts of two counts of robbery in the first degree (Pen. Code, §§ 211, 211a and 213), aggravated by the use of a firearm as proscribed by section 12022.5 of the Penal Code. The court ordered that the sentences on each count should run concurrently with each other and concurrently with any unexpired term to which the defendant might have been subjected by virtue of three charged and admitted prior convictions.

He contends (1) that his right to a trial by jury, chosen with a fair possibility for a representative cross-section of the community, was violated; (2) that his right against self-incrimination, his right to remain silent, the attorney-client privilege, and his right to the effective

---

\*Before Molinari. P. J.. Sims. J. and Elkington. J.

[1]Since the sentence is deemed a final judgment only one appeal is involved.

assistance of counsel were all violated because in response to the prosecutor's discovery motion, the court, after the prosecution had rested, elicited from defense counsel that he had no alibi witnesses, and impliedly communicated that response to the prosecutor; (3) that the court erred in denying defendant's motion to permit him to testify free of impeachment by his prior convictions; (4) that the in-court identification procedures were so suggestive as to deprive the defendant of a fair trial and to violate due process; and (5) that the court abused its discretion under the provisions of section 352 of the Evidence Code in admitting evidence which tended to show prior criminality on the part of the defendant. On examination of these contentions in the light of the record, and applicable principles of law, no reversible error is found. The judgment must be affirmed.

The offenses giving rise to defendant's convictions arose from the robbery of a P.G. & E. office in Richmond on April 2, 1973. An armed robber took considerable cash from each of two cashiers at that office. He was observed by the two cashiers, and by a schoolboy who all originally gave descriptions consistent with the appearance of the defendant. One of the cashier's selected the defendant's picture from a group of photographs but she was unable to identify him positively as the robber at either the preliminary examination or the trial, although she felt he was the man. The second cashier did not identify the defendant's picture, but testified at both the preliminary examination and at the trial that the defendant was the robber. The schoolboy did not testify at the preliminary hearing, but at the trial he testified that the defendant was not the robber he saw running away, because the defendant did not have a mustache and a scar. A palm print found on the counter was identified as that of the defendant.

The defendant did not testify. He produced one witness who testified she had seen him in the P.G. & E. office at some uncertain date near the day of the robbery. Other evidence indicated that the office and the counter were regularly cleaned. Two other witnesses testified that at or about the time of the robbery, the defendant, allegedly a barber, had a neat facial appearance, not the scraggly beard described by witnesses for the prosecution.

Other facts are set forth below where pertinent.

I

Before the start of the trial the defendant objected to the panel from which the jury would be selected on the grounds that it did not include a fair proportion of blacks or persons from the area where the crime occurred. He now claims that the court erred in denying his challenge because the only facts before the court made a prima facie showing of improper exclusion of both a geographical class and racial class in the selection of jurors, and because the trial court erred in taking judicial notice that the jurors were summoned in the county by random computer selection from the voter lists.

■ It is well established, and recognized by the People, that a defendant is entitled to a jury panel selected without the intentional systematic exclusion of an identifiable substantial·class of citizens. (See *Peters* v. *Kiff* (1972) 407 U.S. 493, 497 [33 L.Ed.2d 83, 90-91, 92 S.Ct. 2163]; *Apodaca* v. *Oregon* (1972) 406 U.S. 404, 412 [32 L.Ed.2d 184, 192, 92 S.Ct. 1628]; *Williams* v. *Florida* (1970) 399 U.S. 78, 93-96 and 100 [26 L.Ed.2d 446, 456-458, 460, 90 S.Ct. 1893]; *Swain* v. *Alabama* (1965) 380 U.S. 202, 203-205 [13 L.Ed.2d 759, 763-764, 85 S.Ct. 824]; *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220-225 [90 L.Ed.2d 1181, 1184-1187, 66 S.Ct. 984, 166 A.L.R. 1412]; *Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 59-60 [115 Cal.Rptr. 247, 524 P.2d 375]; *People* v. *Jones* (1973) 9 Cal.3d 546, 553 and 556-557 [108 Cal.Rptr. 345, 510 P.2d 705]; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 749-752 [102 Cal.Rptr. 385, 497 P.2d 1121] [cert. den. (1973) 410 U.S. 947 (35 L.Ed.2d 613, 93 S.Ct. 1382)]; *People* v. *Spears* (1975) 48 Cal.App.3d 397, 400-401 [122 Cal.Rptr. 93]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 120-123 and 124-133 [115 Cal.Rptr. 109]; *People* v. *Murphy* (1973) 35 Cal.App.3d 905, 917-919 [111 Cal.Rptr. 295]; *People* v. *Casillas* (1973) 33 Cal.App.3d 1078, 1080 [109 Cal.Rptr. 579]; *People* v. *Gonzalez* (1972) 28 Cal.App.3d 1091, 1097 [104 Cal.Rptr. 530] [overruled on other grounds *People* v. *Schueren* (1973) 10 Cal.3d 553, 558, fn. 6 (111 Cal.Rptr. 129, 516 P.2d 833)]; *People* v. *McDowell* (1972) 27 Cal.App.3d 864, 869-877 [104 Cal.Rptr. 181]; *People* v. *Gibbs* (1970) 12 Cal.App.3d 526, 538-539 [90 Cal.Rptr. 866]; *People* v. *Newton* (1970) 8 Cal.App.3d 359, 389-391 [87 Cal.Rptr. 394]; *People* v. *Hunter* (1969) 1 Cal.App.3d 461, 466 [81 Cal.Rptr. 750]; *People* v. *Hayes* (1969) 276 Cal.App.2d 528, 533 [80 Cal.Rptr. 893] [overruled on other grounds *People* v. *Ray* (1975) 14 Cal.3d 20, 32 (120 Cal.Rptr. 377, 533 P.2d 1017)]; *Ganz* v. *Justice Court* (1969) 273 Cal.App.2d 612, 618-623 [78 Cal.Rptr. 348]; and *Carmical* v. *Craven* (9th Cir. 1971) 457 F.2d 582, 585-588 [cert. den. (1972) 409 U.S. 929 (34 L.Ed.2d 186, 93 S.Ct. 227)].)

■ In *People v. Jones, supra,* it was established that "the Sixth and Fourteenth Amendments to the United States Constitution as interpreted in *Williams* and *Peters,* guarantee a criminal defendant in a state trial the right to be tried by an impartial jury comprising a representative cross-section of, and selected from residents of, the judicial district where the crime was committed." (9 Cal.3d at p. 556. See also *People v. Spears, supra,* 48 Cal.App.3d 397, 400; *People v. Murphy, supra,* 35 Cal.App.3d 905, 917-919; *People v. Casillas, supra,* 33 Cal.App.3d 1078, 1080; *People v. Gonzalez, supra,* 28 Cal.App.3d 1091, 1097; and *People v. Gibbs, supra,* 12 Cal.App.3d 526, 538-539. Cf. *People v. McDowell, supra,* 27 Cal.App.3d 864, 869-877.)

■ In the instant case defendant relies upon a record which he contends shows that only 3 members of a 54-member panel were from Richmond where the crime was allegedly committed. He asks this court to take judicial notice that in 1974 the Richmond Chamber of Commerce estimated the population of that city at 80,800 which he compares with a 1970 census enumeration of 558,389 for the entire county. He asserts that since only 5.5 percent of the members of the panel come from Richmond, as compared with 14.5 percent of the population which live there, that he has made a prima facie showing of systematic exclusion of Richmond residents from the panel. We pass by the obvious discrepancy that no attempt was made to invite the trial court's attention to the figures upon which defendant now relies. (See Evid. Code, § 453.) In fact the court observed that the jury list contained adequate representation from the west end of the county including Richmond. Defendant relies upon *People v. Newton, supra,* in which the court stated, ". . . any substantial disparity, *over a period of time,* between a group's percentage therein and its percentage in the eligible population is prima facie evidence of discrimination, regardless of the source of jurors, and shifts the burden to the prosecution to justify the discrepancy. [Citations.]" (8 Cal.App.3d at p. 390, italics added.) There was no shift in the burden of coming forward with evidence on the issue of discriminatory selection of jurors in this case because the defendant failed to show that such discrepancies as existed in this case, either as to residency or race, had continued "over a period of time." (Cf. *People v. Spears, supra,* 48 Cal.App.3d at pp. 402-404; *People v. Powell, supra,* 40 Cal.App.3d at pp. 127-142; *People v. Newton, supra,* 8 Cal.App.3d at p. 390; and *Carmical v. Craven, supra,* 457 F.2d at pp. 584-585.) "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." (*Swain v. Alabama, supra,* 380 U.S. at p. 208 [13 L.Ed.2d at p. 766]. See

also *Apocada* v. *Oregon, supra,* 406 U.S. at p. 413 [32 L.Ed.2d at pp. 192-193]; *People* v. *Newton, supra,* 8 Cal.App.3d at p. 390; *People* v. *Hayes, supra,* 276 Cal.App.2d at p. 533; and *Carmical* v. *Craven, supra,* 457 F.2d at p. 586.)

█ The use of voter lists as the sole source of jurors is constitutional, absent a showing of discrimination in compiling the lists or in selecting the names of jurors from them. (*People* v. *Sirhan, supra,* 7 Cal.3d 710, 749-750; *People* v. *Powell, supra,* 40 Cal.App.3d 107, 126-127; and *People* v. *Gibbs, supra,* 12 Cal.App.3d 526, 539.) The record here fails to show, as alleged by defendant, that the trial court did in fact take judicial notice of the manner in which jury lists were made up in Contra Costa County. For this reason, and because the defendants, as noted above, failed to make out a case of systematic discrimination, we do not pass upon the right of the trial court to take such judicial notice. In so refraining, however, we do not intimate that the court if so minded, and upon appropriate notice to the parties, could not take judicial notice of established practices relating to its own administration. (See Evid. Code, § 452, subds. (c), (d) and (e); and *Martin* v. *Superior Court* (1924) 194 Cal. 93, 102-103 [227 P. 762].

## II

On the first day of trial the prosecutor moved to discover from defendant's counsel the name and address of any alibi witness whom the defense might call. The court, following argument, took the matter under submission. The motion was further considered the following day, and, after hearing both parties, the court denied the motion without prejudice to the right to renew it. After he had indicated he was resting his case, the prosecutor again made a similar motion. He indicated that the court should screen the material to insure that nothing incriminating was revealed. Following short argument, the court asked the prosecutor to leave the courtroom. In discussion with the judge the defendant's attorney revealed that at that stage of the proceedings and until two motions he proposed to make were disposed of he could not determine whether to call any alibi witnesses, and that, in any event, he had no witness to call who would testify that at the time the robbery took place the defendant was somewhere else. The court then advised the prosecutor, "I see no necessity to make a discovery order at this time. . . ."

█ The defendant contends that the information imparted to the prosecutor had the same effect as if the motion had been granted, and

the defense attorney had advised the People that no alibi witness would be called. On that basis he claims (1) that his right against self-incrimination was violated, (2) that his right to remain silent was violated, (3) that the action of the trial court violated the attorney-client privilege and (4) that the action of the court and the ensuing revelation to the prosecution violated the defendant's right to the effective assistance of counsel.

It is questionable whether the court's statement carries the import given it by defendant. It is equally open to the interpretation that discovery of the name of any alibi witness would be permitted at a more opportune time, or that the defendant had not yet determined whether or not he would call any alibi witness. In any event, the mere disclosure after the close of the People's case that the defendant is not going to call an alibi witness does not establish as a matter of law that the defendant's right against self-incrimination has been violated, or if so, that he has been prejudiced thereby. In any event, before there can be reversible error the defendant must show that compliance with the court's request for information, as it was finally revealed to the prosecutor, was prejudicial. This defendant has failed to do. (See *People* v. *Lopez* (1963) 60 Cal.2d 223, 244 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Chavez* (1973) 33 Cal.App.3d 454, 462 [109 Cal.Rptr. 157]; *People* v. *Grey* (1972) 23 Cal.App.3d 456, 463 [100 Cal.Rptr. 245]; and *People* v. *Griffin* (1971) 18 Cal.App.3d 864, 871 [96 Cal.Rptr. 218].)

Nevertheless the defendant and the Attorney General have addressed themselves to the propriety of the court's action in taking the action it did, that is, in requesting the defendant's counsel, after the prosecution had rested, to disclose whether he would present alibi witnesses; and if so, their names. Their respective contentions have been reviewed. In *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], the court went no further than to prohibit the discovery of information which "might serve as a link in a chain of evidence tending to establish [the defendant's] guilt of a criminal offense." (2 Cal.3d at p. 327.) It stated that the trial court might "inquire into the incriminatory nature of the information sought" to determine the "possible incrimina-tory effect" of that information. *(Id.)* The court concluded, "We do not intend to suggest that the prosecution should be barred from *any* discovery in this. or any other, case. A reasonable demand for factual information which, as in *Jones,* pertains to a particular defense or defenses, and seeks only that information which defendant intends to introduce at trial, may present no substantial hazards of self-

incrimination and therefore justify the trial judge in determining that under the facts and circumstances in the case before him it clearly appears that disclosure cannot possibly tend to incriminate defendant. However, unless those criteria are met, discovery should be refused." (*Id.,* fns. omitted. See also *People* v. *Lopez, supra,* 60 Cal.2d 223, 244; *People* v. *Hall* (1970) 7 Cal.App.3d 562, 565-567 [86 Cal.Rptr. 504] [hg. den. July 16, 1970, disapproved *Reynolds* v. *Superior Court* (1974) 12 Cal.2d 834, 837, fn. 1 (117 Cal.Rptr. 437, 528 P.2d 45)]; *Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 685-687 [103 Cal.Rptr. 379] [hg. den. Sept. 7, 1972]; *People* v. *Bais* (1973) 31 Cal.App.3d 663, 671 [107 Cal.Rptr. 519] [hg. den. June 13, 1973];[2] and *People* v. *Chavez, supra,* 33 Cal.App.3d 454, 458-460. Cf. *Rodriquez* v. *Superior Court* (1970) 9 Cal.App.3d 493, 496-499 [88 Cal.Rptr. 154] [hg. den. Sept. 4, 1970]; and *McMullen* v. *Superior Court* (1970) 6 Cal.App.3d 224, 227-231 [85 Cal.Rptr. 729].)

In *Reynolds* v. *Superior Court, supra,* 12 Cal.3d 834, the court not only disapproved *People* v. *Hall, supra,* but also approved *Rodriquez* v. *Superior Court, supra,* and stated, in agreement with that case, "We are of the opinion . . . that such a procedural innovation as requiring defendants in criminal cases to give advance notice of alibis should be introduced, if at all, only upon the considered judgment of the Legislature." (12 Cal.3d at p. 837.) The court voiced its "sensitivity to the constitutional constraints on the power of the courts or the Legislature to require a defendant in a criminal case to reveal to the prosecution in advance of the normal course of trial tangible or intangible trial-related evidence or other material." *(Id.)* In reviewing its concept of these constitutional restraints it derogates, "The 'intent to disclose at trial' rationale by which the majority in *Jones* found a defendant's interest in avoiding self-incrimination to be less significant than the court interest in orderly procedures for the ascertainment of truth . . . ." (12 Cal.3d at p. 839.) The court further acknowledged, ". . . it cannot be gainsaid that *Prudhomme* put this court on record as being considerably more solicitous of the privilege against self-incrimination than federal law

---

[2] The implication in *People* v. *Bais, supra,* 31 Cal.App.3d 663, that the prosecution is not entitled to discover a statement made to the defendant's investigator by a witness actually called at the trial is inconsistent with the ruling in *United States* v. *Nobles* (1975) 422 U.S. 225 [45 L.Ed.2d 141, 95 S.Ct. 2160] where the court upheld that such discovery against contentions that it violated the defendant's rights under the Fifth Amendment (422 U.S. at pp. 233-234 [45 L.Ed.2d at pp. 150-151]), under the work product doctrine (*id.,* at pp. 236-240 [*id.* at pp. 152-154]), and under the Sixth Amendment (*id.,* at p. 241 [*id.,* at p. 155]). As pointed out in the opinion, ". . . one cannot invoke the Sixth Amendment as justification for presenting what might have been a half-truth." *(Id.,* at p. 241 [*id.,* at p. 155].)

currently requires." (*Id.,* p. 843. Cf. *Williams* v. *Florida, supra,* 399 U.S. 78, 82 [26 L.Ed.2d 446, 450]; *Wardius* v. *Oregon* (1973) 412 U.S. 470, 473-474 [37 L.Ed.2d 82; 86-87, 93 S.Ct. 2208]; *United States* v. *Nobles supra,* 422 U.S. 225, 233 [45 L.Ed.2d 141, 150-151].)

In *Reynolds* the order required pretrial discovery, and also required the defense to disclose the names, addresses and telephone numbers of any other person whom it subsequently formed the intention to call as an alibi witness, under penalty of being precluded from calling such witness if it failed to comply. (12 Cal.3d, pp. 843-844, fns. 11 and 12.) In *Rodriquez, supra,* the order required each of the defendants and his respective attorney to furnish the prosecution with a list of defense alibi witnesses, if any, who were expected to testify at the trial on or before the commencement of the jury selection at the trial of the case, or as soon thereafter as the name of any such witness became known (9 Cal.App.3d at p. 493). In each case the court relied on the absence of a notice of alibi statute as rendering the order invalid. In *Reynolds* the court refers to "delicate and difficult questions of constitutional law, both state and federal" (12 Cal.3d at p. 842), but it fails to come to grips with those questions other than to observe that *"Prudhomme's* concern for the possible, collaterally incriminatory consequences to an accused of revealing *in advance of trial* the names of defense witnesses -" relates to the fact that such witnesses ". . . if alibi witnesses are especially likely to know the accused personally and hence to assist, unintentionally or not, in the state's investigation of the accused - . . ." (*Id.,* p. 843, italics added.) In *Griffin* v. *Superior Court, supra,* it was recognized that there could be no error in permitting the prosecution to use at a second trial witnesses whose identity had been disclosed under an improper order at an earlier trial, if they in fact had testified for the defendant at the first trial (26 Cal.App.3d at p. 687). When the People rested in the trial of this case, there was no information to be obtained from the witnesses thereafter called by the defendant which would tend to incriminate the defendant, unless it would be by the disclosure of some matters to impeach the testimony of such a witness in order to reveal the true facts. (See fn. 2 above.) The suggestion that the prosecution could reopen its case in chief if such information was obtained (see *People* v. *Bais, supra,* 31 Cal.App.3d at pp. 671-672) is a hazard which would result from the calling of the alibi witness not from the fact his name was prematurely revealed.

It is further suggested that there are intricate problems of reciprocal discovery. This is an illusory objection. The defendant's rights to

discovery, including continuing discovery, are well recognized in this state. It was so recognized by the trial court in *Reynolds*, and the failure to so provide when requested to do so would be invalid under federal standards, even in the absence of more detailed state guidance. (*Id.*, p. 844, fns. 12 and 13.)

A final hurdle is the failure of the prosecution to disclose specifically the time and place of the alleged crime. (*Id.*, p. 845.) If the prosecution has rested its case, it is limited to the time and place established by its proof, and no such problem is involved.

Both cases note the legislative concern with the possible harassment and intimidation of alibi witnesses by police officers. (12 Cal.3d at p. 847, fn. 18; and 9 Cal.App.3d at p. 497.) This evil is not limited to one side or the other and must be controlled by the court in any event.

The true question is not whether this or some other court should fashion a notice of alibi procedure, but whether the trial judge in this case violated any of the defendant's rights in the respects of which he complains.

In *Prudhomme* the court constrained discovery which would reveal an eyewitness, when none were known to the prosecution, or one who could show that the defendant had committed a lesser included offense. The absence of an alibi defense, or witnesses who will testify in support of such defense, is not a link in the chain of evidence which the prosecution must forge to bind the defendant to the offense of which he is charged, nor does the information have a tendency to incriminate the defendant. It could in no sense be a part of the prosecution's proof.

In *Prudhomme* the court did state "that the principal element in determining whether a particular demand for discovery should be allowed is not simply whether the information sought pertains to an 'affirmative defense,' or whether defendant intends to introduce or rely upon the evidence at trial, but whether disclosure thereof conceivably might lighten the prosecution's burden of proving its case in chief." (2 Cal.3d at p. 326.) As we have seen here the prosecution had rested when the court took the action complained of. Nevertheless, defendant suggests that the revelation, compelled by the court, that no alibi witness would be called, as communicated to the prosecution, lightened the latter's burden during the last half of trial by relieving it of the necessity to prepare for alibi witnesses. He relies on *People* v. *Bais, supra,* 31

Cal.App.3d 663, which suggested that the disclosure of extrajudicial statements of alibi witnesses who had already testified would lighten the prosecutor's burden as such statements could be used to impeach the witnesses, might be helpful in reopening the case for the People in rebuttal, or in preparing the People's case in the event of a retrial. (See 31 Cal.App.3d at pp. 671-674. Cf. fn. 2 above.) Even if it be assumed that *Bais'* equating of any matters that might lighten the prosecution's burden with a violation of the provision against self-incrimination is correct, it is not controlling here. In this case no discovery was ordered, and the fact that there were no alibi witnesses called is one that the completion of the trial would reveal in any event.[3] ■ Moreover, it is now established that the mere disclosure of information which may reflect on the credibility of a witness who has in fact been called by the defense is not precluded by any constitutional privilege. (See *United States* v. *Nobles, supra,* 422 U.S. 225, 233 [45 L.Ed.2d 141, 150-151]; and *People* v. *Chavez, supra,* 33 Cal.App.3d 454, 462.)

It is true that a criminal defendant may not be called as a witness or forced to testify. (*Black* v. *State Bar* (1972) 7 Cal.3d 676, 685 [103 Cal.Rptr. 288, 499 P.2d 968]; *People* v. *Whelchel* (1967) 255 Cal.App.2d 455, 460 [63 Cal.Rptr. 258]; *Killpatrick* v. *Superior Court* (1957) 153 Cal.App.2d 146, 148-151 [314 P.2d 164]; and *People* v. *Talle* (1952) 111 Cal.App.2d 650, 663-668 [245 P.2d 633].) There are many things, however, which the defendant or his counsel may be required to communicate to the court to expedite the smooth progress of his case through the courts. It is not a question of the defendant never opening his mouth. (See *People* v. *Ellis* (1966) 65 Cal.2d 529, 534-535, fns. 5 and 6 [55 Cal.Rptr. 385, 421 P.2d 393], and accompanying text.) The question is whether the information sought to be elicited is such that will tend to incriminate him. Consideration must also be given to the question of

---

[3]In fact the defendant called three witnesses. Two testified that at or about the time of the robbery the defendant had a neat, not a scraggly beard, such as the prosecution witnesses had attributed to the robber. The third testified that she had seen the defendant in the P.G. & E. office at sometime around the time of the robbery, thus permitting an explanation of his palm print on the counter. The deputy district attorney requested and was granted permission to recall either of the first two witnesses later in the case after he had an opportunity to investigate them and the facts to which they testified. He did not avail himself of this privilege. The third witness' identity was disclosed prior to her testifying because a bench warrant was secured to insure her presence. She was impeached by the admission of two prior felony convictions for forgery.

As pointed out in *Williams* v. *Florida, supra,* the prosecution was entitled to time to investigate the witnesses and the matters to which they testified. (399 U.S. at pp. 85-86 [26 L.Ed.2d at pp. 452-453]. See Pen. Code, § 1050; and cf. *People* v. *Linder* (1971) 5 Cal.3d 342, 346-347 [96 Cal.Rptr. 26, 486 P.2d 1226]; and *People* v. *Fong Chung* (1907) 5 Cal.App. 587, 589-590 [91 P. 105].)

whether the information sought is information which will be revealed in any event during the course of the trial. If it is, the United States Constitution gives no protection. "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. . . . We decline to hold that the privilege against compulsory self-incrimination guarantees the defendant the right to surprise the State with an alibi defense." (*Williams* v. *Florida, supra,* 399 U.S. 78, 82, fn. omitted and 86 [26 L.Ed.2d 446, 450, 452]. See also *Wardius* v. *Oregon, supra,* 412 U.S. 470, 474 [37 L.Ed.2d 82, 87].) The dissenting justices predicated their dissent on the fact that there was a distinction between announcing an alibi defense before trial and announcing it after the prosecution had produced its evidence at the trial. (399 U.S. at pp. 108-109 [26 L.Ed.2d at pp. 480-481].) "The search for truth is not served but hindered by the concealment of relevant and material evidence. Although our system of administering criminal justice is adversary in nature, a trial is not a game. Its ultimate goal is the ascertainment of truth, and where furtherance of the adversary system comes in conflict with the ultimate goal, the adversary system must give way to reasonable restraints designed to further that goal." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].)

██ Similar considerations govern the claim of attorney-client privilege. It is generally recognized that the privilege does not apply to that which will be revealed in the course of trial in any event. (See *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, 327, fn. 10; and *Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 62 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213].)

The defendant is entitled to the effective assistance of counsel. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464-466 [34 Cal.Rptr. 863, 386 P.2d 487].) Defendant's argument that the extension of discovery will chill the relationship of defendant and his attorney, encourage the latter to avoid witnesses who could possibly possess adverse information, and avoid recording in any manner the statements of any witnesses, must fall on deaf ears. The attorney's "duty to investigate carefully all defenses of fact and of law that may be available to the defendant" (*People* v. *Ibarra, supra,* 60 Cal.2d at p. 464) does not extend to the fabrication of a setting which must rest on concealment of the truth. As stated in *United States* v. *Nobles, supra,* ". . . one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." (422 U.S. at p. 241 [45 L.Ed.2d at p. 155].) The attorney cannot be required to reveal

unfavorable material unless and until it becomes part of the warp and woof of that which he presents in court. With that restriction there is no limit to the investigation the attorney may make, or th disclosures he may secure from his client in confidence.

There was no error in the court's action with respect to the prosecution's motion for discovery.

## III

After the defendant had presented two of his three witnesses he made a motion under *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] to secure a ruling that if he testified he would not be impeached by evidence of his prior convictions. In the complaint he was charged with, and had admitted, a conviction of grand theft November 6, 1967, a conviction of possession of a firearm by an ex-felon on January 16, 1970, and a conviction of burglary on August 9, 1972. In addition, it appeared that on April 24, 1973 he was convicted of second degree robbery on his plea of guilty and had been sentenced to state prison for that offense and for the 1972 burglary on revocation of his probation.

The defendant's counsel pointed out the danger of prejudice to the defendant, particularly from the recent conviction of robbery, when he stood charged with the same offense allegedly committed on April 2, 1973. He pointed out that the defendant wanted to testify to explain the presence of his palm print on the counter and that it was important for the jury to hear his explanation, particularly since a witness he had expected could not be located. (Cf. *People* v. *Jackson* (1974) 37 Cal.App.3d 496, 499 [112 Cal.Rptr. 411]; *People* v. *Stewart* (1973) 34 Cal.App.3d 244, 248-249 [109 Cal.Rptr. 826] [cert.den. (1974) 415 U.S. 959 (39 L.Ed.2d 574, 94 S.Ct. 1489)]; and *People* v. *Delgado* (1973) 32 Cal.App.3d 242, 250-254 [108 Cal.Rptr. 399].) (The last witness' consort subsequently testified to defendant's presence in the P.G.&E. office on an occasion other than the robbery. See fn. 3 above.) ■ The court ruled that grand theft, burglary and robbery were offenses which bore on the defendant's veracity, and ruled that the convictions of those offenses, although not the firearm offense, could be used to impeach the defendant if he testified because he was not entitled to a false aura of veracity. The defendant refrained from testifying. He requested and the court gave CALJIC Instruction No. 2.60 (3/70).[4]

---

[4]This instruction read: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus the decision as to whether he should testify is left to the defendant. acting with the advice and assistance of his attorney. You must

In *People* v. *Delgado, supra,* 32 Cal.App.3d 242, the court recapitulated as follows: ". . . the *Beagle* court enumerated several of the more important factors to be considered by the trial court in exercising its discretion: (1) whether the prior conviction was based upon dishonest conduct or conduct of a violent or assaultive nature; (2) whether the prior conviction was recent or remote in time; (3) whether the prior conviction was for the same or substantially similar conduct as that presently charged; and (4) the possibility that the defendant will choose not to testify out of fear of being prejudiced as compared with the importance of the jury's having defendant's version of the facts. (6 Cal.3d at p. 453.)" (32 Cal.App.3d at p. 248. See also *People* v. *Coleman* (1973) 32 Cal.App.3d 853, 860 [108 Cal.Rptr. 573].)

The last prior conviction, for robbery, was for the same offense as the present charge, robbery. *Beagle* cautions that such convictions should be used sparingly. (6 Cal.2d at p. 453.) Defendant suggests that the court should at least have restricted impeachment by that offense in view of the availability of other sources of impeachment. (See *People* v. *Jackson, supra,* 37 Cal.App.3d 496, 499. Cf. *People* v. *Wingo* (1973) 34 Cal.App.3d 974, 981-983 [110 Cal.Rptr. 448]; *People* v. *Delgado, supra,* 32 Cal.App.3d 242, 250-251; and *People* v. *Hayden* (1973) 30 Cal.App.3d 446, 449 [106 Cal.Rptr. 348].) The court apparently concluded that it would give the defendant "a false aura of veracity" (see *People* v. *Beagle, supra,* 6 Cal.3d at p. 453) to omit reference to the fact that the defendant's dishonest conduct had continued after 1972. (See *People* v. *Stewart, supra,* 34 Cal.App.3d at p. 248.) Though reasonable minds might differ "there was a rational basis for the trial court's ruling and no abuse of discretion." (*People* v. *Hayden, supra,* 30 Cal.App.3d at p. 449.) It may be considered better practice to omit reference to a similar crime where prior convictions of other dishonest conduct are available for impeachment. Nevertheless it is not improbable, and a decided possibility, that in any event the defendant would have avoided testifying if he knew that he would be impeached by reference to his convictions for grand theft and burglary.

not draw any inference of guilt from the fact that he does not testify, nor should this fact be discussed by you or enter into your deliberations in any way."

The defendant also requested CALJIC Instruction No. 2.61 at the outset of the trial, but this instruction was not given. The record is silent as to the reason, but it may be noted that the instruction as it originally read had at the time of trial, October 5, 1973, been shortly before, May 16, 1973, criticized in *People* v. *Vargas* (1973) 9 Cal.3d 470, 477 [108 Cal.Rptr. 15, 509 P.2d 959]. (See also *People* v. *Glass* (1975) 44 Cal.App.3d 772, 778-780 [118 Cal.Rptr. 797].) In any event we could not find reversible error for failure to give that instruction in the light of the other instructions given. (See *People* v. *Gardner* (1969) 71 Cal.2d 843, 853-854 [79 Cal.Rptr. 743, 457 P.2d 575].)

Here the defendant showed cause why he should take the stand and that it was important that the jury should hear evidence to explain the manner in which his palm print came to be on the counter in the premises which were robbed. We do not interpret *Beagle* as implying that a show of necessity may permit a defendant to testify free of impeaching restraints which would apply to any other witness. The trial court here in the proper exercise of its discretion concluded that if the defendant desired to give his version of his prior presence in the premises he should be duly prejudiced by having the jury learn of his prior dishonest conduct, and that it would unduly prejudice the pursuit of the truth to permit him to testify free of such impeachment. No abuse of discretion has been shown. It may be noted, without implying that such is an indispensable attribute to permitting impeachment by a prior felony when the defendant demonstrates a necessity to testify, that the evidence he proposed to produce was elicited from another witness. (See *People* v. *Jackson, supra,* 37 Cal.App.3d at p. 500; and *People* v. *Wingo, supra,* at p. 983.)

No prejudicial abuse of discretion has been demonstrated in connection with the court's ruling on the use of defendant's prior convictions for impeachment.

IV

█ Defendant asserts that the identification procedures permitted by the court were so suggestive as to deprive him of a fair trial, and violate due process of law. In order to understand his position it is necessary to review the background for the testimony elicited in court in October 1973, six months after the robbery. The prosecution presented 3 witnesses who had observed the robber, 2 cashiers who were robbed, and a schoolboy, 14 years old at the time of the trial, who had observed a man flee from the P.G.&E. office and drive off in a car operated by a second man. Immediately after the robbery each had given a description which was consistent with the defendant's appearance. (Cf., however, fn. 3 above.) There was never any lineup, but photographs of several suspects had been exhibited to the two cashiers, and each cashier had appeared and seen the defendant at his preliminary examination.

Nona Thompson, the first cashier accosted by the robber, testified that her attention was directed to the robber when he walked in because he was tall and she thought he was a "nice looking guy." He walked up to the counter with a yellow envelope in his left hand just like any other

customer paying a bill and then said "Give me all your money." He said that he had a gun and would use it. He took out a gun, held it up in his right hand which she could see, pointed it directly at her and said, "You don't believe me, bitch, I'll shoot you." It took a little time for the reality of the situation to sink in, but she gave him all the 20 and 10 dollar bills in her cash drawer. He then reached over and got a bundle of one dollar bills out of the cash drawer. In the course of reaching with his left hand he placed it on the counter. When he reached over, his face was only a foot from hers. After the robber had taken all her money, he ordered the second cashier to turn over her money, and after she did so he departed out the front door. This witness estimated that the whole occurrence took between three and five minutes. On the basis of her observations she described her assailant as a slender black man, six feet two or three inches tall, with a rather scraggly thin mustache, a little below his lip, that was uneven and untrimmed. He had a little fuzz all over his face, no beard, but sideburns down the side of his face. She did not observe any scar over the left eye, midway between the hairline and eyebrow of the robber. She observed and could recall that he was wearing a blue jacket, and that he did not have gloves on. Her attention was focused on his face, and at the time she did not notice and she could not recall whether or not he wore a hat, but thought he had one on because she could not remember seeing his hair. She recalled his mouth and nose, and observed that he was wearing sunglasses with plastic frames.

Immediately following the occurrence she gave the police a general description of her observations as later outlined in her testimony. The following day an officer exhibited some photographs in two or three folders but she was unable to pick out as the robber any of those depicted. She testified at the preliminary hearing that she did not pick out any because she did not see a picture that looked like the robber. At the trial she explained that she did recognize one of the pictures as someone from her own town, and that she pointed to another picture as representing an individual with a mouth similar to that of the person she had observed in the office. This picture was later produced and identified as a picture of someone other than the defendant. She did not remember seeing a picture of the defendant in the photographs exhibited to her. She later learned that Miss Hale, her fellow cashier, though unsure, had picked out someone.

At the preliminary examination on May 14, 1973, the defendant was the only young black man in the courtroom, and no one else was presented to her as the possible robber. She then identified the defendant

as the man who robbed her, and later told Miss Hale she had done so. She reviewed her preliminary hearing testimony prior to testifying at the trial.

At the trial, over the objection of his counsel, the defendant was directed to stand directly in front of the witness at a distance of 12 feet or less. She was requested to take a look at his height, his weight and his general build, and his face. She then testified that based on her observations on April 2, the defendant's height and general body build were consistent with that of the man she saw that day; that she would say, and was of the opinion, that with the exception of the absence of a mustache, the defendant appeared to be the man who robbed her. She repeated that her opinion was based on recognition of the face that she saw in front of her with the gun, and not from seeing him at the preliminary hearing or from other information or photographs. She basically remembered his mouth and nose the most, and also his voice.

Cynthia Hale, the second clerk, was looking down at her cash drawer counting her money and first observed the robber when she looked to her left and saw a man standing four or five feet away in front of Miss Thompson with a lot of money in his left hand. Further observation indicated he had a gun in the other hand. When he said, "Give me all your money," she complied. He took the money in his left hand and turned to walk away while Miss Hale went to the back of the office to call the police. According to this witness the entire incident between her and the robber took place in 10 or 15 seconds. She observed that he was six feet two or three inches in height and of average build, not extremely thin or heavy, and that he had on a blue jacket and a black hat. She had no recollection concerning his trousers or his shoes. Although she looked at the robber's facial features she did not observe, so she could recall, the physical features such as his nose, his mouth, the presence or absence of facial hair, whether or not he was wearing glasses, whether or not he had a scar on his left forehead, the nature of his hair or whether he was wearing a wig.

She identified a black hat found at the scene as resembling that worn by the robber, although, because of his height, she had not been able to see the colored hatband. Shortly after the occurrence she told an officer the few things she had actually observed. The witness did not recall telling the officer that she could not identify the robber, but the officer testified that she said she did not know whether she could identify him or not, and he wrote in his report that Ms. Hale did not think she could identify the person.

The following day an officer exhibited three different sheets of photographs with four or six photographs on each page to Miss Hale. She picked out one as possibly depicting the man who robbed her. It proved to be a photograph of the defendant. According to the witness "It just seemed like it could be the person, but I couldn't say then that it was definitely the person." The photographs were identified by the officer who exhibited them to the witnesses. He explained the manner in which the photographs were separately shown to the two cashiers, and he stated that Miss Hale came back to one particular photo after scanning them all, and stated that the person depicted strongly resembled the man who held her up, but that to be positive she would have to see him in person.

Prior to testifying at the preliminary examination this witness told the district attorney that she had no clear image of the robber in her mind. When she testified on that occasion she first saw the defendant seated at the counsel table to her left. The only other black person in the courtroom was an individual seated in the back of the room. On that occasion she testified, "He looks like he could be the man, but I have no clear image in my mind," and that she did not know on what she based that opinion of identity. She later learned from her fellow cashier that the latter had identified the defendant as the robber at the preliminary hearing.

At the trial, over his counsel's objection, the defendant was posed in front of the witness, at a distance she indicated separated her from the robber. She testified that his height and build was consistent with the man she saw on the day of the robbery, and that when she looked at the defendant she felt that he was the robber but she could not say definitely that he was. She further stated, "I cannot definitely say he is the person but I feel that he's the person including his facial features. I did look at them, look at him, even though it was for a brief moment. I just—I couldn't describe his facial features but I did look at the man then, and it's just—it's hard to explain how I feel." She acknowledged that the day of the robbery, the preliminary examination and at the trial were the only three occasions on which she saw the defendant or felt that she saw him, but she insisted her testimony at the trial was not dependent on what she experienced or stated at the preliminary examination, but was predicated upon what she felt on the basis of her original observation. She was unable to pinpoint or explain the feeling that the defendant looked familiar.

The schoolboy testified that at about the time of the robbery he and a friend were sitting on a car in a parking lot adjacent to the P.G.& E.

office when a black man came running from an area by the back of the office. He was bent over and held in his hand a wig or hairpiece containing money. He passed within 20 feet of the witness, stopped and looked at him and his companion, ran on and entered a car, and was driven away by a second man. He described the man as about six feet two or three inches, slim, dressed in a blue sports jacket and jean pants. The witness observed that the man had a mustache and some sideburns.

Shortly after the occurrence he was interviewed by an officer and gave him a description of the suspect's size and clothes, and the license number of the car. He told the officer he could identify the man if he saw him again. That officer confirmed that he had received such information while interviewing both boys, and that there was no mention of any scar on the suspect's forehead. Ten days after the robbery another officer interviewed the witness and his companion separately. The witness acknowledged that he had not told either officer that the suspect had a scar on his forehead. He testified that he was never shown any photographs or taken to any lineup. The second officer testified that he received a similar description from the witness and that there was no mention of a scar although he had asked him if the person observed had any distinguishing marks. According to the officer, although not reflected in his report, each of the schoolboys expressed a certain amount of uncertainty with respect to being able to identify the man, although it was possible that the witness, as he testified, had said he could identify the robber if he saw him.

The witness further acknowledged that on two occasions he had talked with the prosecutor about the description of the man he observed and had never mentioned seeing a scar on his forehead.

At the trial, again over objection, the defendant was required to exhibit himself to the witness at a distance which the witness estimated separated him from the fleeing man who looked at him on April 2. The witness then testified "He doesn't look like the man." He stated he seemed to be different because the man, in contrast to the defendant who appeared before him, had a mustache and a scar over his head. The witness then for the first time related that he had observed a scar, an inch and one-half long halfway between the suspect's left eyebrow and the hairline of his natural hairdo. According to the witness the man he saw fleeing was not wearing or carrying glasses.

The court permitted testimony, offered to show possible bias, that the witness had been arrested, about three weeks previous to testifying, by an officer of the same police department as had been involved in the investigation of the robbery.

Defendant's argument is predicated on the theory that a one party show-up is inherently suggestive even when it occurs in the courtroom, and that the evil was enhanced in this case by the prosecution's tactic of exhibiting the defendant to the witnesses in a position approximating that under which each respectively observed the robber. The dangers of a pretrial show-up of a single suspect have often been recognized. (See *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; *People* v. *Bisogni* (1971) 4 Cal.3d 582, 586-587 [94 Cal.Rptr. 164, 483 P.2d 780]; and *In re Hill* (1969) 71 Cal.2d 997, 1003-1006 [80 Cal.Rptr. 537, 458 P.2d 449] [cert.den. (1970) 397 U.S. 1017 (25 L.Ed.2d 432, 90 S.Ct. 1254).]) If the in-court identification carries with it the suggestiveness of the pretrial identification it may be suppressed. (See *People* v. *Caruso* (1968) 68 Cal.2d 183, 187-190 [65 Cal.Rptr. 336, 436 P.2d 336]; and *People* v. *DeVaney* (1973) 33 Cal.App.3d 630, 636 [109 Cal.Rptr. 276]. Cf., where independent in-court identification, *People* v. *Greene* (1973) 34 Cal.App.3d 622, 639-647 [110 Cal.Rptr. 160]; and *People* v. *Dobson* (1970) 12 Cal.App.3d 1177, 1181 [91 Cal.Rptr. 443].) It has been recognized that there is a similar suggestiveness when the original confrontation is one-to-one in the courtroom with the suspect identified by his presence at the counsel table. (See *Evans* v. *Superior Court* (1974) 11 Cal.3d 617, 621 [114 Cal.Rptr. 121, 522 P.2d 681]; *People* v. *Holt* (1972) 28 Cal.App.3d 343, 352 [104 Cal.Rptr. 572] [cert.den. (1973) 413 U.S. 921 (37 L.Ed.2d 1044, 93 S.Ct. 3072)]; *People* v. *Doran* (1972) 24 Cal.App.3d 316, 320 [100 Cal.Rptr. 886]; *People* v. *Wheeler* (1971) 23 Cal.App.3d 290, 308 [100 Cal.Rptr. 198]; and *People* v. *London* (1969) 274 Cal.App.2d 241, 242 [78 Cal.Rptr. 848]. Note *People* v. *Faulkner* (1972) 28 Cal.App.3d 384 at p. 389 [104 Cal.Rptr. 625].)

Insofar as the defendant contends that the in-court show-ups at the preliminary examination and the trial were improperly suggestive, he is not sustained by existing precedent. In *Evans* v. *Superior Court, supra,* the court recognized the hazard, and established the following principle: "We conclude in view of the foregoing that due process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate. The right to a lineup arises, however, only when eyewitness identification is shown to be a material issue and there exists a

reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (11 Cal.3d 617, 625, fn. omitted.) The court disapproved *People* v. *Holt, supra, People* v. *Doran, supra,* and *People* v. *London, supra,* insofar as they indicated that the court had no power to order a lineup on the motion of defendant in a proper case. (*Id.* at p. 625, fn. 6.) It, however, did not overrule the principle that an identification made in front of the jury carries with it the circumstances under which it was made, which, in turn, can be argued to and weighed by the jurors. (See *People* v. *Wheeler, supra,* 23 Cal.App.3d 290, 308-309; and *People* v. *London, supra,* 274 Cal.App.2d 241, 243.) Moreover, it is apparent from the testimony given in this case that the suggestion from observing the defendant at the preliminary examination did not permeate the testimony of Miss Hale, whose testimony was qualified by her doubts at both the preliminary examination and the trial. It is obvious that the schoolboy was not unduly influenced by seeing the defendant in court. The other cashier, who failed to recognize the defendant's picture, was adamant that her recognition at the preliminary examination and at the trial was based on what she observed at the time of the robbery. No error appears. (See *In re Hill, supra,* 71 Cal.2d 997, 1007; *People* v. *Greene, supra,* 34 Cal.App.3d 622, 647; *People* v. *DeVaney, supra,* 33 Cal.App.3d 630, 636; *People* v. *Dobson* (1970) 12 Cal.App.3d 1177, 1181 [91 Cal.Rptr. 443]; and *People* v. *Hawkins* (1970) 7 Cal.App.3d 117, 122-125 [86 Cal.Rptr. 428]. Cf. *People* v. *Bisogni, supra,* 4 Cal.3d 582, 587-588.)

There is no merit in defendant's contention that he was improperly required to exhibit himself to the witnesses. ■ It is well established that neither the principle against self-incrimination nor due process of law is violated by requiring the defendant to exhibit himself in court in a manner consistent with that which was observed with respect to the perpetrator of the offense with which he is charged. (See *Schmerber* v. *California* (1966) 384 U.S. 757, 762-764 [16 L.Ed.2d 908, 914-916, 86 S.Ct. 1826]; *Holt* v. *United States* (1910) 218 U.S. 245, 252-253 [54 L.Ed. 1021, 1030, 31 S.Ct. 2]; *People* v. *Ellis* (1966) 65 Cal.2d 529, 534-535 and fn. 6 [55 Cal.Rptr. 385, 421 P.2d 393]; *People* v. *Lopez, supra,* 60 Cal.2d 223, 243-244; *People* v. *Holt, supra,* 28 Cal.App.3d 343, 350-351; *People* v. *Turner* (1971) 22 Cal.App.3d 174, 180-182 [99 Cal.Rptr. 186]; and *People* v. *Lyons* (1970) 4 Cal.App.3d 662, 667 [84 Cal.Rptr. 535].)

No prejudicial error has been demonstrated in connection with either the in-court or pretrial identification procedures.

V

 Finally it is asserted that the court abused its discretion under the provisions of section 352 of the Evidence Code and committed reversible error in permitting the fingerprint expert to testify that the card identifying the palm print found on the counter came from a section of his records "devoted to black suspects suspected of similar crimes."

On direct and cross-examination the expert testified that he compared the latent prints removed from the counter with rolled ink cards. He did not have the name of any suspect to check on, but pulled out cards himself to make a comparison. He first compared the latent prints with a card from the Berkeley Police Department which indicated it bore rolled ink prints from defendant. That card had been in his files since March 22, 1973. He obtained the card from a section of his files which he routinely checked for this type of crime. He could not recall in what sequence the defendant's prints came up in the stack that he had, and he possibly could have compared the latent prints with other cards. He later compared the latent prints with a rolled ink card obtained from the defendant on April 16, 1973, when he was taken into custody and he used that card for a blown-up display in court.

In the examination of the officer who secured the latent prints and an envelope apparently carried by the robber when he first appeared at the counter, the prosecutor referred to "latent lifts turned in to" the identification person and material "turned over" to him. He also elicited from the former witness that he personally had turned the names of certain suspects over to the identification officer. On cross-examination of the first officer the defense attorney referred to material "submitted to" the identification officer. The identification officer testified that he first saw the latent fingerprints and the envelope secured at the scene of the crime when he removed them from a locked box in the basement of the Hall of Justice. The defense attorney vigorously, but vainly, cross-examined the expert in order to attempt to establish that the former officer had given him the material personally and suggested a suspect with whose known prints the exhibits should be compared. The expert insisted that he had had no communication from the former officer at the time he made his initial comparison. The defense attorney also brought out that the officer made his initial determination of the identity of the defendant's rolled ink print with the latent print from the counter by looking at the entire pattern of each without specific reference to the particular points of similarity which he subsequently developed, and that

he may have arrived at that conclusion in a couple of minutes on April 3, 1973, when he first compared the prints. Thereafter he did not compare that latent print with anyone else's rolled ink print; nor, after finding that the other latent print from the counter was dissimilar with the defendant's rolled ink print, did he endeavor to determine who might have made it.

The question asked by the prosecutor reads, "Officer Keller, Mr. Hoehn asked you on cross-examination where and why you picked up Mr. Breckenridge's card to look at and not all the other ones in your file. What portion of your file did you obtain Mr. Breckenridge's card from?" Defense counsel promptly objected. Out of the presence of the jury the court learned that his answer would be, as ultimately given before the jury, that the defendant's card was pulled from "a section [of his fingerprint files] devoted to black suspects suspected of similar crimes." The prosecutor attempted to justify the use of this evidence on the theory that the cross-examination had the effect of indicating to the jury either that the expert was lying in denying that the first officer had given him the defendant's name, or that the officer arbitrarily selected the defendant and refused to consider others. The court agreed with that analysis and overruled the objection. We cannot say that our examination of the evidence indicates, as stated by the trial judge, "that the jury doesn't know how in the world [the witness] happened to pluck that one out of the file." It appears he examined several out of an unnamed section which the witness routinely checked on that type of crime. Such information was sufficient without prejudicial amplification, and the court was close to abusing its discretion in permitting what appears to be an unnecessary elaboration on the explanation already given. (See Evid. Code, § 352; *People* v. *Beagle, supra,* 6 Cal.3d 441, 452-454; and *People* v. *Griffin* (1967) 66 Cal.2d 459, 466 [58 Cal.Rptr. 107, 426 P.2d 507]. Cf. *People* v. *Delgado, supra,* 32 Cal.App.2d 242, 248-249; and *People* v. *Diamond* (1970) 10 Cal.App.3d 798, 801 [89 Cal.Rptr. 126].) In any event the prejudice to the defendant from the jury learning that his name and fingerprints were maintained in a section of the fingerprint records devoted to black suspects suspected of robbery, was only a slight degree more prejudicial than the information already elicited. The card itself showed that it originated with the Berkeley Police Department. On cross-examination it was brought out that the card had been received by the Richmond Police Department some 11 days prior to the crime in question, and that it was filed in a particular section of the latter department's fingerprint files to which the expert resorted for securing a comparison. Both in cross-examination and on redirect, after the receipt

of the objectionable evidence, the testimony indicated that other cards from the same section were pulled out for examination. Even without the objectionable answer the jurors would infer that the defendant had had prior brushes with the law. On the whole record no reversible prejudicial error has been demonstrated from permitting the question and answer of which complaint is now made. It is not reasonably probable that the jury would have arrived at a different result had the answer been excluded. (See Cal. Const., art. VI, § 13; Pen. Code, § 1258; and *People* v. *Watson* (1956) 46 Cal.2d 818, 834-838 [299 P.2d 243].)

The judgment is affirmed.

A petition for a rehearing was denied December 12, 1975, and appellant's petition for a hearing by the Supreme Court was denied January 14, 1976. Mosk, J., was of the opinion that the petition should be granted.