Opinion
 

 ASHBY, J.
 

 —In a jury trial appellant was convicted on multiple counts involving three different victims of first degree burglary (three counts, including one with great bodily injury), attempted murder, first degree robbery, assault with a deadly weapon, and rape. He was also found to have been armed with a deadly weapon on three of the counts, and the
 
 *637
 
 trial court found true a prior conviction of robbery. The court sentenced appellant to state prison consecutively on three counts involving different victims (assault with a deadly weapon, first degree robbery, and burglary with great bodily injury), and stayed execution of sentence on the other counts with provision for the stay to become permanent upon service of sentence on the three pertinent counts.
 
 [1]
 
 This appeal is from the judgment.
 

 Facts
 

 At approximately 10 a.m., December 3, 1975, appellant knocked on the door of Mrs. Christine Behling’s home in the San Fernando Valley. After asking if her husband was at home and if she was interested in janitorial services, appellant forced his way inside, grabbed Mrs. Behling with one hand and held a knife at her arm with the other hand. Mrs. Behling screamed, and when Mrs. Behling’s mother called out from another room, appellant ran. Mrs. Behling identified appellant in court and at a lineup.
 

 At 2:30 p.m. December 16, 1975, appellant pushed his way into the home of Mrs. Catherine Monarch in Granada Hills after asking if her husband was at home and if she wanted any cleaning services. Appellant drew a knife, pushed Mrs. Monarch to the floor, and held the knife at her throat. He thereafter took money from her purse and raped her. He then left, telling her to wait in the bedroom and not to run after him. Mrs. Monarch identified appellant at trial and at a lineup. Appellant’s fingerprint was taken from the inside front door of the Monarch residence.
 

 At 2:30 p.m. that afternoon a neighbor of Mrs. Monarch’s, Gary Hart, saw a black man driving a brown Cadillac slowly down the street looking at houses. He wrote down the license number, 252KIA, and identified People’s exhibits 7 and 8 as photographs of the car.
 

 At 1:30 p.m. on January 21, 1976, appellant pushed his way inside the front door of the home of Cheryl Lipkin in Panorama City after asking if she wanted her house cleaned. Appellant took a knife from his pocket and pushed Mrs. Lipkin down on the living room floor. She screamed and resisted, and appellant stabbed her six times. Despite the struggle
 
 *638
 
 and her injuries, she was able to lunge out the front door, screaming for help from her neighbor, Chris Tripoli. Mrs. Lipkin observed appellant run to his car, and she saw the middle two numbers of the license plate, “52.” Mrs. Lipkin identified appellant at trial and at a videotape of the lineup.
 

 Christine Tripoli, the next door neighbor, came out into her yard in response to the screams and saw a black man run to a gold Cadillac parked in front of her house. She wrote down the license plate number, 252KIA, and identified exhibits 7 and 8 as photographs of the car.
 

 Another neighbor, Cheryl Finger, heard the screams and observed appellant running from the Lipkin house to the gold Cadillac, whose license number, 252KIA, she wrote down. She identified appellant at trial and at a videotape of the lineup, and identified the photographs of the car.
 

 As a result of the stab wounds, Mrs. Lipkin was hospitalized for 11 days, several days in intensive care. The wounds were all in or around the left side of her chest and resulted in internal bleeding of about one liter of blood, which is 15 to 20 percent of a person’s entire blood supply.
 

 Identification papers belonging to appellant were found on the front porch of the Lipkin home. Appellant was arrested that evening at his residence, where police officers observed a gold Cadillac, license number 252KIA, shown in exhibits 7 and 8. When appellant put his pants on, the arresting officer noticed a red smear on them.
 

 After advice and waiver of his constitutional rights, appellant stated to Officer Reliante that he had been driving aimlessly in Panorama City thinking about his problems and found himself driving repeatedly over the same street. He approached a house to solicit for his maintenance service, and the screen door was opened for him to give his card. “The next thing I knew, she was on the floor and I was on top of her. I heard her screaming, and I looked up and seen a small boy standing next to us crying and screaming. I could not understand what the boy was saying. I got scared, and the female got up and left out the front door, and I ran out the front door also. I ran across the front lawn to where my car was parked, and I observed a female standing by her front door next door to where the woman lived. I got in my car and drove off and made the first left turn I could. I pulled over to the curb and looked down at my hands and noticed my hands were covered with blood, and I had a knife in my
 
 *639
 
 hand.” Appellant described his car as a 1965 brown or tan Cadillac, license number 252KIA. Officer Sellante showed appellant the identification papers found in the Lipkin residence and appellant admitted they were his. When asked how he lost them, appellant put his head down and said, “Is she dead?”
 

 Appellant presented a defense of mistaken identification, through testimony that some witnesses had indicated another person looked like or might possibly be the suspect.
 

 Contentions
 

 Appellant contends (1) that the court erroneously denied appellant’s motion to strike his prior conviction; (2) that the showing of a videotape of the lineup was unlawful in the absence of appellant’s counsel; (3) that the court erroneously instructed the jury on diminished capacity and intent; and (4) that the method of selecting the jury panel in the Northwest Judicial District of Los Angeles County is unconstitutional. None of these contentions has merit.
 

 Prior Conviction
 

 The prosecution charged, and the trial court found true, that appellant was previously convicted of a felony, first degree robbery, in April 1972.
 
 [2]
 
 To prove the prior, the prosecution introduced exhibit 1, which contained certified copies of the judgment, the order of commitment to the Youth Authority, and an order of the Superior Court of the City and County of San Francisco, dated April 4, 1972, showing that appellant, who was represented by counsel and who waived his right to trial by jury, pleaded guilty to first degree robbery. Appellant argues that the trial court should have stricken the prior on the ground that exhibit 1 did not show whether appellant had been advised of his privilege against self-incrimination and right to confront and cross-examine witnesses.
 
 (Boykin
 
 v.
 
 Alabama,
 
 395 U.S. 238, 243-244 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709];
 
 In re Tahl,
 
 1 Cal.3d 122, 132 [81 Cal.Rptr. 577, 460 P.2d 449].) This contention is without merit.
 

 
 *640
 
 Denial of the right to counsel is the only constitutional infirmity in a prior conviction which may be attacked by a motion to strike.
 
 (People
 
 v.
 
 Coffey, 67
 
 Cal.2d 204, 215 [60 Cal.Rptr. 457, 430 P.2d 15];
 
 People
 
 v.
 
 Vienne,
 
 30 Cal.App.3d 266, 271-272 [105 Cal.Rptr. 584];
 
 People
 
 v.
 
 Malloy,
 
 41 Cal.App.3d 944, 952-953 [116 Cal.Rptr. 592].) Furthermore, the prior was over four years old, and appellant made no showing whatsoever that he had ever attempted to attack or set aside the plea in a timély or appropriate manner, or that he had an excuse for failing to do so.
 
 (In re Ronald E,
 
 19 Cal.3d 315, 321-323 [137 Cal.Rptr. 781, 562 P.2d 684].) In the absence of such showing, the alleged infirmity in the prior was waived and could not be collaterally attacked.
 
 (In re Ronald E., supra,
 
 at p. 322.)
 
 [3]
 

 Videotape of Lineup
 

 Appellant was arrested on Januaiy 21, 1976. A lineup was held January 22, which was attended by victims Behling and Monarch and witness Tripoli. A videotape of this lineup was made, and the videotape was shown to witness Finger on Januaiy 26 and to victim Lipkin on Februaiy 2, after she got out of the hospital. The videotape was viewed by the court on appellant’s motion to suppress the identifications by Mrs. Finger and Mrs. Lipkin, and by the jury during trial. There is no suggestion in the record that thé lineup itself was unfair or that the circumstances surrounding the two viewings of the tape were prejudicial or unfair to appellant. Appellant nevertheless argues that the videotape identifications should have been suppressed on the sole ground that appellant’s counsel was not present during the viewings of the videotape.
 
 [4]
 
 This contention is without merit.
 

 It has repeatedly been held that the right to counsel does not apply to photographic showings as distinguished from live lineups.
 
 (United States
 
 v.
 
 Ash,
 
 413 U.S. 300, 321 [37 L.Ed.2d 619, 633', 93 S.Ct. 2568];
 
 People
 
 v.
 
 Lawrence, 4
 
 Cal.3d 273, 277 [93 Cal.Rptr. 204, 481 P.2d 212];
 
 People
 
 v.
 
 Rist,
 
 16 Cal.3d 211, 216-217 [127 Cal.Rptr. 457, 545 P.2d 833];
 
 People
 
 v.
 
 *641
 

 Holt,
 
 28 Cal.App.3d 343, 348-349 [104 Cal.Rptr. 572], See also
 
 People
 
 v.
 
 Callaghan,
 
 63 Cal.App.3d 897, 901 [134 Cal.Rptr. 134].) The presence of counsel is not essential in such situations because where the photographs are available at trial, defense counsel has adequate opportunity to disclose to the jury any possibilities for unfairness.
 
 (People
 
 v.
 
 Rist,
 
 supra, at p. 217.) In this regard no distinction can reasonably be drawn between photographs and a videotape. In
 
 fact,
 
 a. videotape probably offers the defendant a better opportunity to argue the circumstances of the lineup than the presence of counsel would provide. (See
 
 People
 
 v.
 
 Moran,
 
 39 Cal.App.3d 398, 408-411 [114 Cal.Rptr. 413].)
 

 Appellant argues that counsel, if present, could have observed the behavior of the police and the viewers. But this same argument would apply to cases of photographic showings; the courts nevertheless have repeatedly found that no right to counsel exists in such circumstances.
 

 Instructions
 

 In light of appellant’s statements to Officer Bellante, appellant requested that diminished capacity instructions be given as to the two offenses in the Lipkin incident, burglary and attempted murder. The trial court instructed on diminished capacity as it related to the attempted murder count, but did not specifically instruct on diminished capacity as it relates to the intent necessary for burglary. Assuming this was error as to the Lipkin burglary, as contended by appellant, it was not prejudicial because in finding appellant guilty of attempted murder in that same incident the jury necessarily rejected his evidence of diminished capacity. (P
 
 eople
 
 v.
 
 Sedeño,
 
 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)
 

 During jury deliberations the jury asked for a rereading of Mrs. Lipkin’s testimony and clarification of the word “intent.” After the testimony was read, the trial court instructed the jury as indicated in the footnote.
 
 [5]
 

 
 *642
 
 Focusing on the italicized sentence, appellant argues this remark failed to take into account the other evidence relevant to appellant’s state of mind. The sentence cannot be viewed in isolation, however, since the court in its remarks repeatedly referred the juiy back to the written instructions.
 
 [6]
 

 Appellant complains, however, that there was also an error in the written instruction on how intent is shown. The court gave CALJIC No. 3.34 in its entirety as follows:
 

 “The intent with which an act is done is shown by the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act.
 

 “[For the purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it
 
 *643
 
 is charged, constituted the crime described in the information.]” The use note to CALJIC No. 3.34 (3d rev. ed. 1970) states: “Do not give second paragraph in a specific intent crime if there is evidence of diminished capacity.” The reason is that the reference to soundness of mind could possibly have a potential for confusing the jury in a diminished capacity case.
 
 (People
 
 v.
 
 Wingo,
 
 34 Cal.App.3d 974, 978-979 [110 Cal.Rptr. 448].) The court in
 
 Wingo,
 
 however, held that the instructions must be taken as a whole, that the jury was adequately instructed on diminished capacity, and that it could not be said the instruction caused the jurors to become confused to the extent that it constituted prejudicial error.
 
 (Id.
 
 at p. 979.)
 

 Likewise the jury in this case was adequately instructed on diminished capacity in relation to the attempted murder and was also instructed not to single out any certain sentence but to consider all the instructions as a whole. The record does not indicate such confusion as to constitute prejudicial error. We note that the evidence of diminished capacity was minimal. It consisted solely of statements by appellant to Officer Bellante referring to not remembering how he found himself on the floor on top of Mrs. Lipkin. There was no evidence of intoxication. There was no medical evidence. Appellant did not testify. Very strong evidence of appellant’s ability to harbor the necessary intent was provided by the Behling and Monarch incidents which occurred the previous month. They clearly showed a common modus operand! in which appellant knocked on the doors of homes in midday claiming to be soliciting cleaning business, and after determining that the husband was not home, forced his way through the front door and assaulted the women at knife point. During the Monarch incident, appellant said, “I’m here for two reasons. I want your money [and] I’m going to fuck you.” There was no prejudicial error in the instructions.
 

 Challenge to Jury Panel
 

 Prior to trial, appellant, who is black, challenged the method of selecting the jury venire in the Northwest Judicial District of Los Angeles County, where the crimes occurred and this matter was tried, on the ground that it systematically excluded blacks from jury service. The trial court denied appellant’s motion to quash the jury panel or to transfer the case to the Central Judicial District.
 

 Because of its population and geographical area, Los Angeles County has nine judicial districts. Previously, the jury venires for cases tried in the districts other than the central district were drawn from lists of
 
 *644
 
 registered voters who resided in the particular district. Because of the compelling need reasonably to accommodate all interested persons and to minimize inconvenience to jurors and expense to the county, this system was upheld against the claim that in some districts the proportion of blacks was less than the proportion for the county as a whole.
 
 (People
 
 v.
 
 Taylor,
 
 46 Cal.App.3d 513, 532-533 [120 Cal.Rptr. 762];
 
 Adams
 
 v.
 
 Superior Court,
 
 27 Cal.App.3d 719, 728, 732 [104 Cal.Rptr. 144], See also
 
 People
 
 v.
 
 Langdon,
 
 54 Cal.App.3d 384, 388 [126 Cal.Rptr. 575].)
 

 However, the system was subsequently changed by legislative enactment. Under the present wording of Code of Civil Procedure section 206, subdivision (b), jurors in each district are selected on a countywide basis but a juror is exempt from liability to act as a juror in any court which is more than 20 miles from his residence, upon proper claim of this exemption.
 
 [7]
 
 In
 
 People
 
 v.
 
 McDowell,
 
 27 Cal.App.3d 864, 874-875 [104 Cal.Rptr. 181], the court upheld the practice in San Bernardino County of excusing all jurors who lived more than 25 miles from the courthouse.
 

 In this case appellant attempted to prove that the number of blacks on the jury panel for the northwest district was less than what should be expected based upon the total black population. In the testimony of a demographer and in the legal argument to the court, appellant’s attack was directed to the new 20-mile exemption. However, his own proof showed that the number of blacks in proportion to the total population was greater
 
 within
 
 the 20-mile radius of the courthouse in Van Nuys than it was for the county as a whole. Blacks constituted 14.3 percent of the population within the 20-mile radius as compared with 10.8 percent for the county as a whole.
 
 [8]
 
 When the court pointed out to appellant that his own evidence seemed to indicate that the 20-mile exemption could not possibly be responsible for the claimed reduction in black juiy panel members, appellant retreated somewhat, basically to the position that he did not know what was wrong with the system but that the alleged
 
 *645
 
 disparity required justification by the prosecution.
 
 [9]
 
 Appellant’s proof on this point, however, fell far short of the requirements held applicable to this type of analysis.
 

 The burden of proof is on the defendant to show a purposeful and systematic exclusion of a cognizable group within the community.
 
 (People
 
 v.
 
 Breckenridge,
 
 52 Cal.App.3d 913, 919 [125 Cal.Rptr. 425];
 
 People
 
 v.
 
 Spears,
 
 48 Cal.App,3d 397, 401 [122 Cal.Rptr. 93];
 
 People
 
 v.
 
 Powell,
 
 40 Cal.App.3d 107, 127 [115 Cal.Rptr. 109];
 
 People
 
 v.
 
 Newton,
 
 8 Cal.App.3d 359, 388-389 [87 Cal.Rptr. 394];
 
 Swain
 
 v.
 
 Alabama,
 
 380 U.S. 202, 208-209 [13 L.Ed.2d 759, 766, 85 S.Ct. 824].)
 
 [10]
 

 Demonstrated proof of a substantial history of grossly inadequate representation over a period of time can constitute evidence raising an inference of purposeful and systematic discrimination so as to shift the burden to the People to show that the disparity does not result from purposeful discrimination.
 
 (People
 
 v.
 
 Pinell,
 
 43 Cal.App.3d 627, 632 [117 Cal.Rptr. 913];
 
 People
 
 v.
 
 Powell, supra,
 
 40 Cal.App.3d 107, 133;
 
 People
 
 v.
 
 Spears, supra,
 
 48 Cal.App.3d 397, 404;
 
 People
 
 v.
 
 Breckenridge, supra,
 
 52 Cal.App.3d 913, 920;
 
 People
 
 v.
 
 Newton, supra,
 
 8 Cal.App.3d 359, 389-390.) But the disparity must be proved and the difference must be substantial enough to have an effect on the quintessence of the jury venire.
 
 (People
 
 v.
 
 Powell, supra; People
 
 v.
 
 Spears, supra.)
 

 Appellant’s proof of the alleged disparity was unsatisfactory and was properly rejected by the trial court.
 
 (People
 
 v.
 
 Powell, supra.)
 
 The jury commissioner kept no records of the racial composition of the jury
 
 *646
 
 panels. As proof of the racial composition of the juiy panels, appellant offered the testimony of 12 deputy public defenders who practiced in that courthouse. They were merely asked about their recollection as to how many blacks they had viewed on the jury panels for trials they had participated in during the past year. This referred to the panels usually consisting of 30 potential jurors, occasionally of 45 to 60, which were sent out to those deputies’ departments by the jury commissioners.
 
 [11]
 
 The deputies testified to having observed that some of these panels had no blacks and others had one, two, three, or four. Only one deputy had seen more than four blacks on a panel and most said that they had never seen more than two or three. These were estimates only, not based on any exact record keeping. This record falls short of providing any reliable estimate of the number or percentage of blacks who were on the jury panels.
 

 Appellant’s proof as to the base population against which this uncertain number was to be measured was also unsatisfactory. The figures presented by appellant’s demographer were based on total black population, not black voters. The initial pool of potential jurors was, of course, taken from voter registration lists. This selection method has repeatedly and recently been upheld.
 
 (People
 
 v.
 
 Sirhan,
 
 7 Cal.3d 710, 749-750 & fn. 26 [102 Cal.Rptr. 385, 497 P.2d 1121];
 
 People
 
 v.
 
 Cabral,
 
 51 Cal.App.3d 707, 715 [124 Cal.Rptr. 418];
 
 People
 
 v.
 
 Breckenridge, supra,
 
 52 Cal.App.3d 913, 921;
 
 People
 
 v.
 
 Newton, supra,
 
 8 Cal.App.3d 359, 389-390.) Courts have repeatedly emphasized that no reliable conclusion can be drawn when total population rather than voter population is used as the base.
 
 (People
 
 v.
 
 Powell, supra,
 
 40 Cal.App.3d 107, 128-129, 133;
 
 People
 
 v.
 
 Spears, supra,
 
 48 Cal.App.3d 397, 404;
 
 Adams
 
 v.
 
 Superior Court, supra,
 
 27 Cal.App.3d 719, 729.)
 
 [12]
 

 Thus, neither the juror number nor the base number against which it was to be compared was proved in any reliable manner. As we stated in
 
 People
 
 v.
 
 Powell, supra,
 
 40 Cal.App.3d 107, 133: “The trial court was not required to accept these statistical conclusions unless it was persuaded that they were founded on substantially reliable data.” Appellant asserts in his brief, without explanation how he arrives at the figure, that the percentage of blacks on the jury panels was between 3 and 6 percent. He then compares this to the demographer’s estimate that within the 20-mile
 
 *647
 
 radius of the courthouse 14.3 percent of the total population (not registered voters) is black. “Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. . . . We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%.”
 
 (Swain
 
 v.
 
 Alabama, supra,
 
 380 U.S. 202, 208-209 [13 L.Ed.2d 759, 766].) A disparity sufficient to make a prima facie case of discrimination must be substantial.
 
 (People
 
 v.
 
 Newton, supra,
 
 8 Cal.App.3d 359, 390.) Bearing in mind the unreliability of appellant’s data, a substantial disparity was not shown in this case.
 

 The judgment is affirmed.
 

 Stephens, Acting P. J., and Hastings, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied December 28, 1977.
 

 [1]
 

 After trial, another case was consolidated with this one, appellant pleaded guilty to attempted sodomy of a fourth victim, and was also sentenced thereon, with dismissal of three other counts involving that victim, of rape, oral copulation, and robbery.
 

 [2]
 

 Appellant was committed to the Youth Authority for this offense. Since robbery is not an alternate felony-misdemeanor, the commitment to the Youth Authority did not render the conviction a misdemeanor. (Cf. Pen. Code, § 17.) Appellant was on parole from the Youth Authority. (Cf. Welf. & Inst. Code, § 1772.)
 

 [3]
 

 Appellant did not expressly claim that he was not advised of his
 
 Boykin-Tahl
 
 rights at the time of the prior plea. His counsel merely claimed that since the minute order of April 4, 1972. recited that jury trial was waived, the failure of the minute order also to recite that the privilege against self-incrimination and right to confrontation were waived supported a reasonable inference they were not. Since appellant’s attempt to attack the prior was otherwise defective, we express no opinion on the validity of this argument.
 

 [4]
 

 On January 26. the same day as the viewing of the tape by Mrs. Finger, appellant was brought before a magistrate, a deputy public defender was appointed to represent him, and the preliminary hearing was set for February 5 or 6.
 

 [5]
 

 “THE COURT; All right. Now. you have asked in the second part for a clarification of the word ‘intent’ in reference to attempted murder. I don’t know what to say to you. sir. I have given you the instructions. I have read them to you. An attempt is in no way correlated with an intent. I have given you the specific instructions of ‘attempt’ which consists of the specific intent to commit the crime and an ineffectual consummation of it because of something that happens later on. and that’s what makes it an attempt rather than the crime itself. “The intent with which an act is done, and specifically murder, the specific intent can be expressed in a number of ways. Basically I oversimplify it. The specific intent is to kill. But the specific intent, as I originally gave it to you, is the willful, deliberate, and
 
 *642
 
 premeditated intent to kill a human being with malice aforethought. That would be the classical murder of the first degree, or an intent to kill or cause great bodily injury with malice aforethought. I can’t think of any—1 get into philosophical instructions, and I don’t want to avoid it, but intent, as an isolated factor in itself, just means the intent to kill. But you have to interpret the intent along with other things to determine whether or not there was an attempted murder, whether or not there was an attempted manslaughter or anything else, and so it is very hard for me to isolate a word out of context and say what is the relationship between attempt and intent.-1 can define each word, but it isn’t going to help you that much. You have to take the whole thing in its total concept, and again. I am going to oversimplify it but tell you an attempt is the beginning of a crime that is stopped someplace before its consummation but after it had started well enough that it would have been a consummated crime if something didn’t intervene. “An intent cannot be isolated again by itself because murder is a very complex type of crime, and I completely oversimplify it if I say the only specific intent is the intent to kill. It is the intent to kill with something else, and it is with malice aforethought or in conjunction with certain other activities, and I just don’t believe that I can improve upon the written definitions and instructions that were given to you. “Now, if you have a specific question. I would rather you ask it of me and then I will know how you are thinking. You know. I am trying to answer something so much in the abstract now that I am afraid I may mislead you rather than clarify things for you. “THE FOREMAN: Well, the word ‘intent.’ that was the main word we were tossing around. “THE COURT: Well, that’s a mental process. “THE FOREMAN: Yes. right. “THE COURT:
 
 You have to determine what was in the mind of the defendant at the particular time, and vou can on/v know that hv manifestations of actions that occurred at that time.”
 
 (Italics added.)
 

 [6]
 

 Likewise, the statement “[a]n attempt is in no way correlated with an intent” cannot be viewed in isolation because it was immediately followed by the statement “I have given you the specific instructions of ‘attempt’ which consists of the specific intent to commit the crime and an ineffectual consummation of it because of something that happens later on, and that’s what makes it an attempt rather than the crime itself.”
 

 [7]
 

 Code of Civil Procedure section 206, subdivision (b), reads: “(b) In a county of the first class all trial jurors shall be selected annually on a countywide basis. A person is exempt from liability to act as a juror in any court which is more than 20 miles from his residence if, when summoned as a juror, he makes and transmits his affidavit to the jury commissioner, stating that he lives more than 20 miles from the court for which he is summoned and the address of his residence. If the affidavit is sufficient in substance, it shall be received as an excuse for nonattendance in person at the court to which the affiant was summoned.”
 

 [8]
 

 The 20-mile radius on the map in evidence included most of the population in the predominantly black Watts area.
 

 [9]
 

 “MR. RAMEY [Counsel for appellant]: I will just have to confine my remarks here to the practical result that we see. You may have a point there on the theoretical impact of that, though I don’t see the reason for it. and the fact remains that we are losing a portion of the black population as potential jurors, so that we are just talking about something that is highly theoretical and hasn’t been practically seen. Even though it might seem to inure to our benefit, it hasn’t inured to our benefit. “My overall conclusion. Your Honor, is that for some reason we are not getting anywhere near the percentage of Blacks that we are entitled to. It seems to me. a black defendant should be entitled to a fair cross-representation of the community. We have shown this as a prima facie matter that this is the practical effect of what we are seeing happening here with the current system, and that people should have to justify the procedures and the effect of what we see. That’s all."
 

 [10]
 

 Appellant erroneously relies upon
 
 People
 
 v.
 
 Superior Court (Dean),
 
 38 Cal.App.3d 966. 972 [113 Cal.Rptr. 732], for the proposition that he need not show purposeful discrimination. At page 971 the court itself states that the accused has the burden of showing systematic and purposeful discrimination. The court’s other remarks were in the context of an attack upon the method of selecting members of the
 
 grand jury
 
 through personal nomination by the judges of the superior court, a system which offers greater possibilities for discrimination than the random methods used in selecting trial jury venires.
 

 [11]
 

 The jury panel for the entire courthouse consisted of 360 potential jurors.
 

 [12]
 

 Appellant’s demographer indicated that one could expect a higher number of children in a black family because of the high birth rate in the black population.