[Crim. No. 39049. Second Dist., Div. One. Aug. 8, 1985.]

In re DEBORAH LINN RHYMES on Habeas Corpus.

COUNSEL

John K. Van de Kamp, District Attorney, Harry B. Sondheim and Sterling S. Suga, Deputy District Attorneys, for Appellant.

Carl B. Pearlston, Jr., under appointment by the Court of Appeal, for Respondent.

OPINION

TUCKER, J.*—This is an appeal by plaintiff and real party in interest, the People, from an order of the Superior Court of Los Angeles County granting a petition for a writ of habeas corpus. This appeal is authorized by Penal

---

*Assigned by the Chairperson of the Judicial Council.

Code section 1506.[1] In granting the petition, the court vacated the judgment of conviction of petitioner and remanded the case for retrial in the Pomona Municipal Court. The superior court ordered that petitioner continue to remain free on her own recognizance. Pending the resolution of the instant appeal, the court below stayed the retrial of petitioner.

### PROCEDURAL HISTORY

Following a jury trial in the Municipal Court for the Pomona Judicial District, the jury on June 21, 1979, found the defendant guilty on the charges of violation of Penal Code section 245, subdivision (a), section 484, subdivision (a), and section 594, subdivision (a).

The defendant appealed to the Appellate Department of the Superior Court of Los Angeles County on July 18, 1979. The defendant also filed a petition for a writ of habeas corpus with the appellate department. In both the appeal and the petition for a writ of habeas corpus, defendant, a Black woman, contended that she was denied her rights under the Sixth and Fourteenth Amendments to the United States Constitution in that she was denied her right to an impartial jury representing a fair cross-section of the community. Defendant asserted that she objected at the trial of her case to the composition of the jury pool of thirty persons and the fact that only one prospective juror was Black. However, the trial judge noted that there were two Blacks in the pool, or that Blacks comprised 6.6 percent of the pool, and overruled the objection. No Black juror was impaneled for the trial of this case. The appeal and defendant's petition for writ of habeas corpus were consolidated for hearing in the Superior Court of Los Angeles County, Appellate Department. During oral argument, the matters were severed, and the appeal from the judgment of conviction was affirmed on the ground that the defendant failed to perfect a sufficient record on appeal for a meaningful review by the appellate department.

In connection with the petition for a writ of habeas corpus, an evidentiary hearing was ordered before a referee, and a judge of the municipal court was appointed. The question posed for determination by the referee was whether the jury selection process in the Municipal Court for the Pomona Judicial District was constitutionally defective because the jury selection process systematically excluded or substantially underrepresented the Black population of that community.

---

[1]Penal Code section 1506 provides in pertinent part as follows: "An appeal may be taken to the court of appeal by the people from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant or otherwise granting all or any part of the relief sought, in all criminal cases, excepting criminal cases where judgment of death has been rendered, and in such cases to the Supreme Court; . . ."

FACTS[2]

George E. Marr is the head of the Population and Human Resources Division of the Department of Regional Planning for Los Angeles County. The department publishes quarterly bulletins. He testified that Blacks and Hispanics are cognizable groups in that community; that according to the 1970 United States Census, Blacks made up 10.85 percent of the population for Los Angeles County, a 65.3 percent increase since 1960; and that Hispanics made up 17.4 percent of the population, a 113 percent increase over 1960. Mr. Marr said that according to the 1977 Special State Census the percentage of Blacks in the Pomona District had increased to 19.3 percent. He also identified the November 1978 quarterly bulletin prepared by his department, showing a net natural increase of 19.52 percent for Blacks and 69.74 percent for Spanish-surnamed individuals in Los Angeles County from 1970 through 1977.

Thomas A. Smuczynski is an operations research analyst in the Community Development Division of the City of Los Angeles. He participated in a study in the area of population trends for the County of Los Angeles. That study showed that the percentage of the Black and Spanish-surnamed population for the County of Los Angeles for 1980 was forecast at 16.2 percent and 28.8 percent, respectively.

Dr. Edward Butler holds degrees in sociology and demography and is chairman of the sociology department at the University of California, Riverside. He has published many books and articles on the subject of demography. He has studied the makeup of the jurors in all of the judicial districts in Los Angeles County, and specifically he conducted a study of the jurors assigned to the Pomona Judicial District for the period May 8, 1979 through August 7, 1979. The information on which this study is based was obtained through questionnaires given to each juror for the period involved.

Dr. Butler explained that absolute disparity is the mathematical difference between the percentage of a group in the population and the percentage of that group on a jury panel. Thus, since the 1970 census showed Blacks to make up 10.8 percent of the Los Angeles County population, and the percentage of Blacks on the Pomona District jury panels was 6.2 percent, the absolute disparity would be 4.6 percent; that is, there would be 4.6 percent fewer Blacks on the jury panels than there are in the county population based on the 1970 census.

Another statistical method of calculating disparity is referred to as comparative disparity. Comparative disparity reflects the probability of an iden-

---

[2]Our statement of facts is based on the referee's summary of evidence.

tifiable group being on a jury panel. According to Dr. Butler, for the period covered by the report, that percentage would be 43 percent; that is, a Black would have a 43 percent lesser chance of being on the jury panel for the Pomona District for the period covered by the report than the percentage of Blacks in the population would suggest.

Dr. Butler also reviewed in a much less detailed way other panels for August and September 1979 and March and April 1980. He concluded that while male and female representation on the panels was balanced, the panels were overrepresented by Caucasians, higher educated persons, persons of higher income, and persons of middle age, whereas there was an underrepresentation of Blacks. Moreover, his studies showed that Blacks and Hispanics are less likely to register to vote than nonminorities. In Dr. Butler's opinion, the use of the Department of Motor Vehicles' driver's license list, together with the voter registration list, would result in a more representative jury panel. He acknowledged that nothing in his studies showed any purposeful discrimination and that his entire basis for the finding of the disparity indicated above is his conclusion that Blacks and Hispanics are less likely to register to vote.

Mr. Raymond F. Arce is director of jury service for the Los Angeles Superior Court and has held that position since March 1979. He testified as to the manner in which the jury panels are selected by the court. First, an annual projection is made in December as to the number of jurors that will be required for the ensuing year. Then registration lists are obtained from the registrar's office. Individuals are selected at random from the list, and questionnaires are then mailed to them. In 1979, 16 percent of the persons mailed questionnaires did not respond. As to such persons, there is no followup mailing. After the questionnaires are returned, they are examined by jury interviewers to determine whether the persons are qualified to serve as jurors and whether they are entitled to be excused.

Mr. Arce indicated that in 1979, out of the original total of 442,325 persons mailed a questionnaire, 100,058 made the master list for that year. Because of a carry-over from the preceding year, 126,523 were summoned to serve in 1979. Of this number, 65,226 persons were paid for serving as jurors for the year 1979.

Mr. Arce testified that in none of the various steps or procedures employed in the selection of the individuals who make the final master list is there any record kept or attempt made to determine the jurors' ethnic backgrounds. The only grouping that occurs is that each juror is requested to indicate whether he will serve anywhere in the county or whether he wishes to limit his service to within 20 miles of his residence. Generally, 98 percent

of prospective jurors request that their service be limited to within 20 miles of their residence. No ethnic composition of the jurors summoned from the Pomona Judicial District was available to the jury commissioner. Mr. Arce said he does not believe the voter registration lists are truly representative of the population of Los Angeles County in that only 54.3 percent of the population is registered to vote.

Mr. George Vertelney is the Director of Information Services for the Office of the Registrar-Recorder of Los Angeles County. He testified that the 1979 total of registered voters for Los Angeles County was 2.9 million. He said that while his office does not have the figures for the Pomona District, the 1970 census reflects that in the City of Pomona, 12.2 percent were Black. He also indicated that as of 1977, 19 percent of the Pomona population was Black, while 20 percent was Hispanic.

The referee made the following findings: "1. That for the period May 8, 1979 to August 7, 1979, 6.2% of the jurors for the Pomona District were Black, and that the county-wide population figures for Blacks is 10.85% for 1970, 11.6% for 1977, and 16.2% for 1980 (projected). [¶] 2. That the make-up of five jury panels for March-April 1980 for the Pomona District was 7.6% Black. [¶] 3. That the percentage of Blacks in the county-wide population is as follows: 1970, 10.85%; 1977, 11.6%; 1980, 16.2% (projected). [¶] 4. That the Jury Commissioner for the Los Angeles Superior Court employs a random draw from the Los Angeles County voters' registration list to compile the jury panels for the Superior and Municipal Courts in Los Angeles County. [¶] 5. That said random draw is racially neutral and not purposefully or intentionally discriminatory. [¶] 6. That there was not a substantial disparity in the number of Blacks on the jury panels for the Pomona District so as to amount to a systematic exclusion of Blacks from said panels for the period involved herein."

Hispanics were not considered by the referee, even though evidence was presented for the gross Hispanic underrepresentation on jury panels, because the objection at the time of trial was as to Blacks only.

The superior court, in issuing the writ of habeas corpus, concluded that petitioner was denied her constitutional right to a petit jury composed of "a representative and fair ethnic community cross-section so as to avoid a disproportionately small number of black prospective or potential jurors in proportion to the total number of available prospective or potential black jurors in the community [*Duren* v. *Missouri* (1979) 439 US 357 (58 L.Ed.2d 579, 99 S.Ct. 664); *Taylor* v. *Louisiana* (1975) 419 US [522 [42 L.Ed.2d 690, 95 S.Ct. 692]]; California Code of Civil Procedure Section 206] . . . ."

The court concluded that "[A] pool or panel of potential jurors taken only from the voter registration lists cannot meet the Constitutional test, at least not in the Pomona Judicial District, as to blacks; and [¶] . . . the use of this single source of jury venire in misdemeanor jury trials in the Municipal Court of California for the County of Los Angeles Pomona Judicial District will continue to result in the systematic exclusion of a fair and representative number of eligible blacks as potential jurors, as discussed in *Foster* v. *Sparks* (5th Cir. 1975) 506 F2d 805, 816-817. . . ."

## DISCUSSION

■ In California the right to trial by a jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]) and by article I, section 16 of the California Constitution. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748].)

The cross-sectional requirement was set forth 34 years ago in *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1184-1185, 66 S.Ct. 984, 166 A.L.R. 1412]. *Thiel* held that jury pools must be representative of a cross-section of the community. The court stated that unless the jury represented a cross-section, there was a danger that it would become "the instrument of the economically and socially privileged" (*id.*, at p. 224 [90 L.Ed. at p. 1186]) and would be representative only of narrow class interests.

This constitutional cross-section requirement was established as binding on the states in *Taylor* v. *Louisiana, supra,* 419 U.S. 522, where the court stated that the right to cross-sectional representativeness was a fundamental right which could not be overcome on merely rational grounds. (*Id.*, at p. 534 [42 L.Ed.2d at p. 700].)

In *People* v. *Wheeler, supra,* 22 Cal.3d 258, 266-267, Justice Mosk speaking for the court stated: "In a series of decisions beginning almost four decades ago the United States Supreme Court has held that an essential prerequisite to an impartial jury is that it be drawn from 'a representative cross-section of the community.' The rationale of these decisions, often unstated, is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only

practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (Fns. omitted.)

In the case of *Smith* v. *Texas* (1940) 311 U.S. 128, 130 [85 L.Ed. 84, 86, 61 S.Ct. 164], Justice Hugo Black said: "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." (Fn. omitted.)

In *Glasser* v. *United States* (1942) 315 U.S. 60, 86 [86 L.Ed. 680, 707, 62 S.Ct. 457], the court warned that those charged with the jury selection process ". . . must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right."

While the random selection from voter registration lists in Los Angeles County as the sole source for potential jurors has been repeatedly upheld (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 749-750 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den., 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382], and overruled on another point in *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 593, fn. 7 [150 Cal.Rptr. 435, 586 P.2d 916]; *People* v. *Lewis* (1977) 74 Cal.App.3d 633, 643-647 [141 Cal.Rptr. 614]; *People* v. *Keith* (1975) 52 Cal.App.3d 947, 952 [115 Cal.Rptr. 109]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 124-127 [115 Cal.Rptr. 109], cert. den., 420 U.S. 994 [43 L.Ed.2d 677, 95 S.Ct. 1435]), the use of voter registration lists as the sole source of jury pools remains subject to challenge. Its validity is certainly questionable where there has been a showing that the resulting jury pools reflect such a substantial disparity as to constitute prima facie evidence of discrimination. (*People* v. *Sirhan, supra,* 7 Cal.3d at pp. 749-750.)

In *Sirhan,* the California Supreme Court stated: "The use of voter registration lists as the sole source of jurors is not constitutionally invalid [citations], at least in the absence of a showing that the use of those lists resulted 'in the systematic exclusion of a "cognizable group or class of

qualified citizens"' [citations] . . . ." (*People* v. *Sirhan, supra,* 7 Cal.3d 710, 749-750.)

In the case of *Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664], the United States Supreme Court set forth the principle that "[i]n order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

The *Duren* prima facie test must be applied to the case before the court.

1. *The group alleged to be excluded is a "distinctive" group in the community.*

A "distinctive" group of citizens is a group of citizens who share a common perspective gained precisely because of membership in the group, which perspective cannot be adequately represented by other members of the community. (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 98 [154 Cal.Rptr. 734, 593 P.2d 595].)[3]

Blacks and Hispanics are distinctive or cognizable groups. (*Castaneda* v. *Partida* (1977) 430 U.S. 482, 495 [51 L.Ed.2d 498, 511, 97 S.Ct. 1272]; *Whitus* v. *Georgia* (1967) 385 U.S. 545 [17 L.Ed.2d 599, 87 S.Ct. 643].)

2. *The representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community.*

In the case of *In re Bell* (1942) 19 Cal.2d 488, 501 [122 P.2d 22], the California Supreme Court observed, "The courts of both the United States and California have declared that the remedy of habeas corpus permits an examination not only of the actual evidence introduced at petitioner's trial but of any necessary additional evidence bearing upon the infringement of petitioner's constitutional rights. [Citations.]"

In *In re McVickers* (1946) 29 Cal.2d 264, 274 [176 P.2d 40], the court stated: "Section 1484 of the Penal Code provides that on such proceedings

---

[3]A "distinctive" group is often referred to as a "cognizable" group. (E.g., *Rubio* v. *Superior Court, supra,* 24 Cal.3d at p. 98; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 280.)

the petitioner may 'allege *any fact* to show either that his imprisonment or detention is unlawful, or that he is *entitled to his discharge.* The court or judge must thereupon proceed in a summary way to hear such proof as may be produced against such imprisonment or detention, or in favor of the same, and to dispose of such party *as the justice of the case may require.* . . .' (Italics added.)"

■ Since *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163], it is clear that a defendant need not be a member of the excluded or underrepresented group successfully to maintain his challenge to the venire from which the jury that tries him is drawn as not being a fair cross-section of the community. (*Taylor* v. *Louisiana, supra,* 419 U.S. 522, 526 [42 L.Ed.2d 690, 695].)

■ Respondent produced evidence before the referee of Hispanic underrepresentation. In an exhibit to the referee's report, Dr. Butler showed that Hispanics constituted 7.1 percent of jury panels in 1979 as compared with their county population percentage of 18.3 percent in 1970, 21.3 percent in 1975, and 28.8 percent in 1980, the latter figure being estimated by Dr. Thomas Smuczynski of the Community Development Division of the City of Los Angeles.

This yields absolute underrepresentation or disparities of 11.2 percent, 14.2 percent and 21.7 percent for the three base periods for Hispanics.

Using the comparative disparity standard, which indicates the probability that a member of a particular group will be selected as a juror, Dr. Butler's study indicates comparative disparities in 1979 for Blacks and Hispanics as follows:

| Year of Base Population Figure | Blacks | Hispanics |
|---|---|---|
| 1970 | 43% | 61% |
| 1975 | 47% | 67% |

As previously mentioned, Dr. Butler's study concluded that the panels were overrepresented by Caucasians, higher educated persons, persons of higher income, and persons of middle age, whereas there was underrepresentation of Blacks; it also concluded that Blacks and Hispanics are less likely to register to vote. Dr. Butler acknowledged that nothing in his study showed any purposeful discrimination by anyone. *His entire basis for the finding of the disparity indicated above is his conclusion that Blacks and Hispanics are less likely to register to vote.*

Mr. George Vertelney, Director of Information Services for the Office of the Registrar-Recorder of Los Angeles County, testified that the 1979 total

of registered voters for Los Angeles County was 2.9 million. He said that while his office does not have the figures for the Pomona District, the 1970 census reflects that in the City of Pomona, 12.2 percent was Black. He also indicated that as of 1977, 19 percent of the Pomona population was Black, while 20 percent was Hispanic.

Appellant contends that the superior court's conclusion is not supported by substantial evidence because no data was presented showing the percentage of Blacks and Hispanics who are over 18 and otherwise eligible for jury service, which appellant contends is the relevant base under the criteria set forth in Code of Civil Procedure sections 198[4] and 199.[5]

He contends that the leading case cited by the superior court, *Foster* v. *Sparks, supra,* 506 F.2d 805, holds that the measurement of statistical disparity should be based upon the eligible ethnic population of the venire measured against the total population.

Appellant also contends that there was no study made as to what number of potential jurors who were sent questionnaires had failed to return them to the jury commissioner. Appellant also argues that there was no indication as to what number of potential jurors sought and did obtain excuse from serving as jurors; that Mr. Arce testified that in 1979, 16 percent of those to whom questionnaires were sent failed to return them; that there was no followup mailing policy; and that no evidence was introduced to allow for correction factors.

Appellant also complains that nowhere in Dr. Butler's study of the Pomona Judicial District is there an in-depth analysis of what percentage of the total population of Blacks are registered voters and qualified citizens.

■ While it is true that courts have repeatedly stated that no reliable conclusion can be drawn when total population rather than voter population[6]

---

[4]Prior to 1980, Code of Civil Procedure section 198 provided: "A person is competent to act as juror if he or she is: [¶] 1. A citizen of the United States of the age of 18 years who meets the residency requirements of electors of this state; [¶] 2. In possession of his or her natural faculties and of ordinary intelligence, provided that no person shall be deemed incompetent solely because of the loss of sight in any degree or other disability which substantially impairs or interferes with the person's mobility; and [¶] 3. Possessed of sufficient knowledge of the English language."

[5]Code of Civil Procedure section 199 provides: "A person is not competent to act as a trial juror if any of the following apply: [¶] (a) The person does not possess the qualifications prescribed by Section 198. [¶] (b) The person has been convicted of malfeasance in office or any felony or other high crime. [¶] (c) The person is serving as a grand juror in any court of this state."

[6]It has been held that voter population may be used to establish a prima facie showing of the eligible population base. (*People* v. *Spears* (1975) 48 Cal.App.3d 397, 404 [122 Cal.Rptr. 93]; *People* v. *Powell, supra,* 40 Cal.App.3d 107, 127.)

or eligible population is used (*People* v. *Powell, supra,* 40 Cal.App.3d 107, 128-129, 133; *People* v. *Spears, supra,* 48 Cal.App.3d 397, 404; *People* v. *Lewis, supra,* 74 Cal.App.3d 633, 646; *People* v. *Mooring* (1982) 129 Cal.App.3d 453, 459 [181 Cal.Rptr. 71]), uncertainty in the ratio between the eligible and the total population does not preclude a court from finding underrepresentation when total population is used as the base.

In *People* v. *McDowell* (1972) 27 Cal.App.3d 864 [104 Cal.Rptr. 181], the appellant contended that the San Bernardino petit jury selection system was constitutionally invalid because the sole source used, voter registration lists, did not provide a representative cross-section of the community. The court stated, "A comparison between readily available census statistics and voter registration lists would seem to be a sufficient basis for a proper challenge to the petit jury selection procedures. [Citation.]" (*Id.,* at p. 870, fn. omitted.)

In *United States* v. *Butera* (1st Cir. 1970) 420 F.2d 564, the court accepted actual population statistics, stating, "[I]t may be so difficult to obtain full and accurate figures for 'jury eligibles' that to require such figures would—at least in some cases—place an insuperable burden on defendant. [Citations.] . . . [W]e will be content with a somewhat greater disparity when general population figures are used . . . ." (*Id.,* at p. 570, fn. 13.) The court in *Castaneda* v. *Partida, supra,* 430 U.S. 482, 495-496 [51 L.Ed.2d 498, 511], indicated that the burden of reducing general population statistics to a more narrowed eligible population rests on the state.

In *United States* ex rel. *Barksdale* v. *Blackburn* (5th Cir. 1980) 610 F.2d 253, 270, the court stated that: ". . . [t]he State . . . had the burden of presenting evidence of what the disparities would have been had a valid age-narrowed population been examined. [¶] . . . *Castaneda* establishes that the burden of proving such factors is on the State and not the petitioner."

3. ■■■ *The underrepresentation is due to systematic exclusion of the group in the jury selection process.*

The term "systematic" means that the underrepresentation is due to some rule or procedure of the selection system.

In the case of *People* v. *Superior Court (Dean)* (1974) 38 Cal.App.3d 966, 971-972 [113 Cal.Rptr. 732], the court stated: "The decisions requiring the accused to show systematic, purposeful discrimination do not square with others which condemn discrimination stemming from negligence or inertia. The latter recognize that official compilers of jury lists may drift into discrimination by not taking *affirmative action* to prevent it. In formu-

lating a panel for a grand jury endowed with the criminal indictment function, officials must adhere to a standard more stringent than mere abstention from intentional discrimination; they have an *affirmative duty* to develop and pursue procedures aimed at achieving a fair cross-section of the community." (Italics added; fn. omitted; also see *Avery* v. *Georgia* (1953) 345 U.S. 559 [97 L.Ed. 1244, 73 S.Ct. 891]; *Cassell* v. *Texas* (1950) 339 U.S. 282, 289-290 [94 L.Ed. 839, 848, 70 S.Ct. 629]; *Akins* v. *Texas* (1945) 325 U.S. 398, 403-404 [89 L.Ed. 1692, 1696, 65 S.Ct. 1276]; *Smith* v. *Texas, supra,* 311 U.S. 128, 131-132 [85 L.Ed. 84, 87]; *Rabinowitz* v. *United States* (5th Cir. 1966) 366 F.2d 34.)

In *Rabinowitz* v. *United States, supra,* 366 F.2d 34, 58, the court stated: "If a fair cross-section is consistently lacking, then, without more, it is established that the commissioners have failed in their duty."

As a consequence, constitutional attack on jury composition may be supported by statistics which demonstrate discriminatory result rather than discriminatory design.

The statistical disparity that the evidence shows in this case raises a presumption of discrimination. Once that presumption has been established, the government cannot dispel it by a mere showing that it has been even-handed in the compilation of the source list. It is not a question of whether there was discrimination, overt or latent, in the selection or composition process, but rather, whether the government has an adequate justification—a compelling interest—for the particular process used when that process results in underrepresentation of specific special ethnic groups.

"Systematic exclusion" is exclusion that regularly occurs and is inherent in the source from which jurors are drawn.

The statistical disparities in this case are considerable for both Blacks and Hispanics. The disparities in this case existed over a period of five months, as well as part of the following year. No evidence was presented to indicate in any way that the data was not typical or representative of an ongoing condition. It can therefore be safely assumed that such underrepresentation existed long before the specific study was performed in 1979 and that the underrepresentation can be expected to continue as long as the voter lists are the sole source for jury lists.

We find that a pool or panel of potential jurors taken only from voter registration lists cannot meet the fair cross-section of the community requirements under the Sixth Amendment and the Fourteenth Amendment due process clause of the United States Constitution and under article I, section

16 of the California Constitution in the Pomona Judicial District and that the use of this single source of jury venire in misdemeanor jury trials in the Municipal Court of California for the County of Los Angeles, Pomona Judicial District, will continue to result in the systematic exclusion of a fair and representative number of Blacks and Hispanics as potential jurors.

Our holding shall apply to this case only, until this case becomes final, and thereafter shall apply prospectively. We so provide because of the extent of reliance on this single source for selection of jury venires and because a retroactive application would have a detrimental effect on the administration of justice. (See *Mills* v. *Municipal Court* (1973) 10 Cal.3d 288, 308 [110 Cal.Rptr. 329, 515 P.2d 273].)

The order is affirmed.

Spencer, P. J., and Dalsimer, J.,* concurred.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.